# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **SOUTHERN VISIONS, LLP,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:18-cv-02039-RDP** |
| | } | |
| **RED DIAMOND, INC.,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

The Wonder Years was an award-winning comedy-drama broadcast on ABC television from 1988 to 1993. Set in a turbulent time in our nation's history, the late 1960s and early 1970s, the show portrays the life and perspectives of Kevin Arnold, a typical teenager raised by stereotypical parents in Anytown, USA. In one particular episode, "Dance with Me," Kevin's relationship with Lisa Berlini is blossoming (ever since their four-minute phone call). As they joke around together in homeroom, the upcoming school dance is announced over the PA system. Kevin decides it is time to take his burgeoning relationship with Lisa to the next level. So, he asks her to the dance (in the most intimate form of communication known to twelve year olds—by passing a note in class).

To his great glee, Lisa writes "OKAY!" (including a smiley face in the "o"). Kevin cannot believe it. Lisa Berlini, who has "the best smelling head of hair in the seventh grade," is going to the dance with him; after all, he has it in writing. But soon after the bell rings, as Lisa and Kevin are filing out of class, the taller, cooler Brad Gaines arrives on the scene. To Kevin's surprise, he asks Lisa to attend the dance with him. And to his dismay, mere minutes after saying yes to Kevin, Lisa accepts Brad's offer. After Brad smiles and walks off, Kevin, obviously

confused, confronts Lisa: "But you just said you'd go [to the dance] with me." Lisa is uncomfortable, but puts up a defense: "That was before Brad asked me. . . . I didn't know he was gonna ask me when I said 'yes' to you."

Red Diamond, Inc., the defendant in this case, may have some sympathy for Kevin. Red Diamond and the law firm Bradley Arant Boult Cummings ("Bradley") have been to several dances over the years. Over the better part of a decade, from 2009 to 2018, Bradley represented Red Diamond in various small matters from time to time. But on December 23, 2018, Bradley began representing Southern Visions, LLP in this significant patent infringement lawsuit against Red Diamond. Bradley knew that its client Red Diamond objected strenuously to the representation, but, much like Lisa Berlini, it was happy to accept what it doubtless viewed as a substantial upgrade. Three days after saying "yes" to Southern Visions, on December 26, 2018, Bradley withdrew from all matters in which it was representing Red Diamond.

Red Diamond has moved to disqualify Bradley from representing Southern Visions against it in this lawsuit. (Doc. # 76). Among other things, Red Diamond claims Bradley violated Alabama Rule of Professional Conduct 1.7(a), which generally forbids the simultaneous representation of two directly adverse clients, when it began representing Southern Visions in this lawsuit. The court held a hearing on the matter on February 11, 2019. After careful consideration of the parties' submissions and argument at the hearing, and for the reasons explained below, the court agrees with Red Diamond. Bradley violated Rule 1.7(a) when it began representing Southern Visions, and disqualification is an appropriate sanction for the violation. Red Diamond's motion to disqualify (Doc. # 76) is accordingly due to be granted.[1]

---

[1] Because the court concludes Bradley should be disqualified for violating Rule 1.7(a), it does not address Red Diamond's disqualification arguments based on Rules 1.9 and 1.10. Additionally, the court agrees with Bradley that the declaration of J. Douglas McElvy (Doc. # 76-5) is inadmissible under Federal Rule of Evidence 702 because it offers merely legal conclusions, which invade the province of the court and are not helpful to the trier of fact. *See*

# I.      Background

To provide relevant context, the court first summarizes Bradley's prior representations of Red Diamond and then reviews the circumstances that gave rise to Red Diamond's disqualification motion.

## A.      Bradley's Prior Representations of Red Diamond

Bradley began representing Red Diamond in January 2009. (Doc. # 76-1 at 1, ¶ 2). At that time, Bradley attorney Ray Gibbons sent a letter to Red Diamond CEO William A. Bowron, Jr. confirming "our engagement as legal counsel to provide general representation" to Red Diamond. (*Id.* at 6). Since 2009, Bradley's work for Red Diamond has been light and sporadic.

In 2011, pursuant to that "general representation" agreement, Red Diamond sought Bradley's assistance during the divorce of Tom Bowron. (*Id.* at 2, ¶ 3). Tom Bowron is the brother of Red Diamond CEO William Bowron and a part owner of Red Diamond. (*Id.*). Because Tom Bowron's ownership interest in Red Diamond was at issue, Red Diamond's financial records were subpoenaed and several Red Diamond executives were deposed. (*Id.*). Bradley attorney Stewart Cox was involved in objecting and responding to the financial subpoenas and representing Red Diamond at the depositions of Red Diamond's CEO William Bowron and its CFO Sherman Pitts. (Docs. # 85-7 at ¶ 3; 76-1 at 2, ¶ 4).

Those sealed deposition transcripts, submitted by Red Diamond for the court's *in camera* review (Doc. # 86), show that Bradley received certain confidential, nonpublic information about Red Diamond during the course of this representation. The information includes, broadly, information about Red Diamond's board of directors, director fees, distributions to owners, ownership interests in the company, shareholder voting rights, audits, facilities, income, loans

<hr />

*Commodores Entm't Corp. v. McClary*, 879 F.3d 1114, 1128-29 (11th Cir.) (2018). Bradley's motion to strike declaration (Doc. # 84) is therefore due to be granted. The court has not considered the declaration in ruling on Red Diamond's motion to disqualify.

and guarantees, family trusts, corporate structure, operating divisions, annual reports, customer identities, company expenses, employee salaries, charitable giving, and other financial information including debt, liabilities, total cost of goods sold, and total sales.

In March 2014, Red Diamond engaged Bradley to advise it on employee benefit matters, including the company's retirement and welfare benefit plans. (Docs. # 76-1 at 2, ¶ 6; 85-5 at ¶ 3). Bradley attorney David Joffe was principally responsible for handling these matters. (Doc. # 85-5 at ¶ 3). Over the four years (2014-2018) that Joffe provided occasional advice to Red Diamond about employee benefit matters, he billed only 26.5 hours for a total of $10,295. (Doc. # 85-5 at 3, ¶ 6).

In December 2014, Red Diamond engaged Bradley to advise it on tax matters. (Doc. # 76-1 at 2, ¶ 5). Bradley attorney Bruce Ely was principally responsible for this representation, and he handled three tax matters for Red Diamond. In the first matter, Ely provided Red Diamond advice about a pending tax audit by a private auditing company. (Doc. # 85-3 at ¶ 3). That matter concluded in 2015. (*Id.*). In the second matter, which occurred in 2017, one of Red Diamond's tax officers was a witness in a proceeding before the Alabama Tax Tribunal relating to a state audit of one of Red Diamond's vendors. (*Id.* at ¶ 4). Bradley billed 13.25 hours to Red Diamond on this matter. (*Id.*). Finally, Ely also billed fifteen minutes to Red Diamond in 2018 for his review of Red Diamond's coffee-maker lease agreement for potential Alabama rental tax issues. (*Id.* at ¶ 3).

Finally, in February 2016, Red Diamond engaged Bradley attorney Ethan Tidmore to represent it in various debt collection matters. (Doc. # 76-1 at 3, ¶ 7). These matters involved restaurants, food marts, or day cares that had purchased food supplies from Red Diamond on credit and then defaulted on payment. (Doc. # 85-4 at ¶ 4). None of these debts exceeded

$25,000, and most were under $5,000. (*Id.* at ¶ 5). Some of these debt collection matters remained pending when Red Diamond filed its motion to disqualify. (Doc. # 76-2 at 2, ¶ 4). As recently as December 12, 2018, Tidmore met for lunch with Red Diamond's Vice President of Finance to discuss the status of these matters. (*Id.* at ¶ 5; Doc. # 85-4 at ¶ 14).

At the outset of most of the engagements described above, Red Diamond signed an engagement letter purporting to provide Red Diamond's prospective consent to Bradley undertaking future representations of other clients "in any matter that is not substantially related" to Bradley's work for Red Diamond, "even if the interests of such clients in those other matters are directly adverse" to Red Diamond, and "even if such representations would be simultaneous." (Doc. # 76-1 at 10, 15, 26). Bradley did not advise Red Diamond to seek independent legal counsel about these advance conflict waivers, and Red Diamond did not seek independent counsel about the waivers. (Doc. # 76-1 at 1-4).

### B.  The Current Dispute

In September 2018, one of Red Diamond's competitors, Southern Visions, filed a major patent infringement action against it in the Northern District of Georgia. (Doc. # 1). Southern Visions claims one of Red Diamond's products -- a device for simultaneously brewing and sweetening tea -- infringes several of Southern Visions' patents. (*Id.* at 5-17). The action was transferred to this court on December 11, 2018. (Doc. # 58).

On December 18, 2018, Bradley attorney Matthew Lembke received a call from one of Southern Visions' owners, Paul Stewart. (Doc. # 85-2 at ¶ 4). Stewart told Lembke that, in light of the transfer to this court, Southern Visions planned to hire a lawyer in Birmingham to work on this case and that Lembke was under consideration. (*Id.*). Lembke responded that he would need to check for potential conflicts. (*Id.*).

After that call, Lembke asked his legal assistant, Amy Hersey, to run a conflicts check with Southern Visions as the potential client and Red Diamond as the adverse party. (*Id.* at ¶ 6). Before coming to Bradley, Hersey had worked as a legal assistant at the law firm Lightfoot, Franklin & White ("Lightfoot"), which represents Red Diamond in this patent infringement suit. (*Id.* at ¶ 3; Doc. # 76-3 at ¶ 2). When asked to run the conflicts check, Hersey immediately informed Lembke that she had worked on the case while at Lightfoot. (Doc. # 85-2 at ¶ 6). Lembke had another legal assistant run the conflicts check instead of Hersey, and she was immediately screened from any involvement in the conflicts review process. (*Id.* at ¶¶ 6-7). Hersey left the office for scheduled vacation from December 22-30, 2018 and was placed on paid administrative leave (where she remains) on December 31, 2019. (*Id.* at ¶ 14; Doc. # 85-1 at ¶ 13).

The day after running the conflicts check, on December 19, 2018, Lembke called Lightfoot attorney Harlan Prater to determine whether Hersey had obtained confidential information about this case. (Doc. # 85-2 at ¶¶ 8-9). If she had, Lembke wanted to know whether Red Diamond would consent to an ethical screen around Hersey to cure any conflict created by her employment with Bradley. (*Id.*). At the hearing on February 11, 2019, counsel for Red Diamond represented that this was the first time Red Diamond learned Bradley was considering representing Southern Visions in this lawsuit.

On the afternoon of December 21, 2018, after completing the conflicts check and learning that Red Diamond was a current client of Bradley's, Lembke met with Southern Visions personnel. (*Id.* at ¶ 11). At the hearing, Lembke described the meeting as a "beauty contest." While in the meeting, Lembke learned that Red Diamond had earlier that day told Bradley it did not consider itself to have consented to any conflict created by Bradley's representation of

Southern Visions, and that in any event Red Diamond revoked any such consent, effective immediately. (*Id.* at ¶ 12; Doc. # 76-1 at 33-34). At the end of that meeting, at about 4:00 pm, Southern Visions decided it wanted Bradley to represent it as lead counsel in this case. (Docs. # 85-2 at ¶ 11; 92-1 at ¶ 3).

Earlier in the day on December 21, at 12:53 pm, Red Diamond CEO William Bowron had sent an email to Bradley attorney Stewart Cox expressing his dismay that Bradley was considering representing Southern Visions in this case. (Doc. # 76-1 at 33-34). Though Bowron is not a lawyer, the email contains classic legalese. In the email, Bowron explained that he was "frankly shocked" Bradley believed the general advance conflicts waivers Red Diamond had signed entitled Bradley to sue Red Diamond while it continued to represent Red Diamond in other matters. (*Id.* at 33-34) (internal quotation marks omitted). In his view, Bowron explained, the advance conflict waivers did not permit Bradley to *sue* Red Diamond while it simultaneously represented Red Diamond in other matters. (*Id.* at 34). But, Bowron went on, "[t]o the degree that [Bradley] or any other relevant party, board, agency, or court could conclude that Red Diamond has consented to [Bradley] representing Southern Visions in the Patent Lawsuit, I want to be clear that Red Diamond unequivocally revokes that consent." (*Id.*). Bowron also expressed his view that Bradley's attempt to represent Southern Visions was nothing "less than a violation of the trust I placed in your firm." (*Id.*).

On the morning of December 23, 2018, Lembke asked Bradley's general counsel, John Watson, to have the firm's business review committee determine whether to approve Bradley's representation of Southern Visions in this lawsuit. (Doc. # 92-1 at ¶ 4). A few hours later, Watson notified Lembke that the Southern Visions representation had been approved. (*Id.*). In Lembke's view, "Bradley represented Southern Visions beginning on December 23, 2018,

following approval of the representation by the firm." (*Id.* at ¶ 8). December 23 "was the first day on which Bradley billed any time for work in connection with" this lawsuit. (*Id.*). A review of Bradley's invoice to Southern Visions, submitted for the court's *in camera* review (Doc. # 93), shows that Bradley lawyers performed about six hours of work on this case on December 23 and 24, the two days before Christmas.

Three days after Bradley lawyers began work on this case for Southern Visions, on December 26, 2018 at 11:18 am, Bradley's general counsel sent an email to Red Diamond withdrawing from its current representations of Red Diamond, effective immediately. (Doc. # 85-1 at 7-8). The email stated that Bradley believed it could represent Southern Visions in this case because of Red Diamond's advance conflict waivers. (*Id.* at 7). Bradley explained that it routinely requires large companies like Red Diamond to agree to such waivers in advance when it handles relatively small matters for them, so that Bradley is not precluded from undertaking more substantial representations on behalf of other clients in the future. (*Id.*). Bradley stated it would not have agreed to represent Red Diamond in the few, small matters that it did without the advance conflict waivers, and that the waivers were an express condition of Bradley's representation of Red Diamond. (*Id.*). The email closed by listing three pending debt collection matters Bradley was handling for Red Diamond, noting that those matters had no pending deadlines, and explaining that Red Diamond would need to obtain other legal counsel if it wished for any further action to be taken in those matters. (*Id.* at 8).

Forty-three minutes after Bradley withdrew from representing Red Diamond, Bradley attorney Matthew Lembke entered an appearance on behalf of Southern Visions in this case. But, to be clear, it is undisputed that Bradley's representation of Southern Visions began on December 23, not December 26.

## II. Legal Standard

"Because a party is presumptively entitled to the counsel of his choice, that right may be overridden only if 'compelling reasons' exist." *In re BellSouth Corp.*, 334 F.3d 941, 961 (11th Cir. 2003). One compelling reason to deny a client counsel of its choice is counsel's violation of an applicable rule of professional conduct. *See Banque de Rive, S.A. v. Highland Beach Dev. Corp.*, 758 F.2d 559, 561 (11th Cir. 1985); *Miccosukee Tribe of Indians of Fla. v. Cypress*, 686 F. App'x 823, 825-26 (11th Cir. 2017); *McGriff v. Christie*, 477 F. App'x 673, 677-79 (11th Cir. 2012); *Herrmann v. GutterGuard, Inc.*, 199 F. App'x 745, 747, 755-57 (11th Cir. 2006).

"The party moving to disqualify counsel bears the burden of proving the grounds for disqualification." *Id.* "A disqualification order is a harsh sanction, often working substantial hardship on the client and should therefore be resorted to sparingly." *Herrmann*, 199 F. App'x at 752 (quoting *Norton v. Tallahassee Mem'l Hosp.*, 689 F.2d 938, 941 n. 4 (11th Cir.1982)) (internal quotation marks omitted).

Two sources of law govern motions to disqualify: the local rules of this court and federal common law. *Herrmann*, 199 F. App'x at 752.

Local Rule 83.1(f) provides that attorneys appearing before this court are governed by: (1) this court's local rules; (2) the Alabama Rules of Professional Conduct (to the extent they are not inconsistent with the court's local rules); and (3) the American Bar Association Model Rules of Professional Conduct (to the extent they are not inconsistent with either the court's local or Alabama rules). N.D. Ala. L.R. 83.1(f). The local rules also provide that violations of those standards may result in a variety of sanctions, including "removal from a particular case." *Id.*

Though state-court interpretations of the Alabama Rules of Professional Conduct are not binding on a federal court tasked with determining whether an attorney should be disqualified

based on a violation of the Rules, they are persuasive authority concerning the Rules' meaning. *See Clark v. Alfa Ins. Co.*, No. CIV.A. 00-AR-3296-S, 2001 WL 34394281, at *5 n.1 (N.D. Ala. Feb. 7, 2001) (Acker, J.).

In deciding whether to grant a motion to disqualify, a district court must first "identify a specific rule of professional conduct applicable to that court and determine whether the attorney violated that rule." *Herrmann*, 199 F. App'x at 755; *see also Schlumberger Techs., Inc. v. Wiley*, 113 F.3d 1553, 1561 (11th Cir. 1997) ("[W]here the district court's disqualification order is based on an allegation of ethical violation, . . . [t]he court must clearly identify a specific Rule of Professional Conduct which is applicable to the relevant jurisdiction and must conclude that the attorney violated that rule."). A district court "may not disqualify an attorney on the basis of some transcendental code of conduct that existed only in the subjective opinion of the court, of which the attorney had no notice." *Schlumberger*, 113 F.3d at 1561 (cleaned up).

If a violation of an ethical rule is found, disqualification may be an appropriate sanction. *See Herrmann*, 199 F. App'x at 747 (affirming disqualification order where district court found violation of Georgia Rule of Professional Conduct). Upon finding a violation of an applicable ethical rule, a district court must then, "considering binding and persuasive federal case law, decide whether or not the ethical lapse warrants disqualification." *Clark*, 2001 WL 34394281, at *3.

## III.     Analysis

Red Diamond's motion to disqualify requires the court to resolve two distinct issues. First, the court must determine whether Bradley violated a rule of professional conduct applicable in this court by undertaking representation of Southern Visions in this lawsuit.

Second, if such a rule violation occurred, the court must decide whether disqualification is an appropriate sanction.

The local rules of this court are silent on attorney conflicts of interest, but they do incorporate by reference the Alabama Rules of Professional Conduct and require attorneys practicing in this court to abide by those rules. *See* N.D. Ala. L.R. 83.1(f). As explained below, the court concludes (1) that Bradley violated Alabama Rule of Professional Conduct 1.7(a) and (2) that disqualification is warranted.

### A.    Bradley Violated Rule 1.7(a)

Red Diamond's motion to disqualify calls for a straight-forward application of Alabama Rule of Professional Conduct 1.7(a). The plain text of Rule 1.7(a) and other provisions of the Rules of Professional Conduct all compel the conclusion that Bradley violated the rule when it began representing Southern Visions on December 23, 2018. Bradley's arguments to the contrary are unpersuasive.

### 1.    The Rule 1.7(a) Violation

Rule 1.7(a) forbids a lawyer from simultaneously representing two clients who are directly adverse to one another unless certain express conditions are met. The Rule provides:

> A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
>
> > (1) The lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
> >
> > (2) Each client consents after consultation.

Ala. R. Prof. Conduct 1.7(a). Importantly, the restrictions Rule 1.7(a) imposes on individual lawyers apply with equal force to law firms because, under Rule 1.10(a), one lawyer at a firm may not "knowingly represent a client" when any other lawyer at the firm "would be prohibited

from doing so" by Rule 1.7 if practicing alone. Ala. R. Prof. Conduct 1.10(a); *see also Ex parte Osbon*, 888 So. 2d 1236, 1238 (Ala. 2004) ("Rule 1.10(a) requires a law firm to be treated as a single attorney.").

Thus, by its plain terms, Rule 1.7(a) imposes two requirements before a law firm may accept a representation that pits a new client against one of the firm's existing clients. First, the law firm must reasonably believe the new representation will not adversely affect its relationship with its existing client. Second, both the new client and the existing client must consent "after consultation."

The facts show Bradley violated the plain language of Rule 1.7(a). It is undisputed that Bradley began representing Southern Visions in this matter on December 23, 2018—the day its business review committee approved the representation and Bradley lawyers began billing time on the matter. (Doc. # 92-1 at ¶ 8). At that time, Bradley still represented Red Diamond in at least three pending debt collection matters. In fact, Bradley did not withdraw from representing Red Diamond in those matters until December 26, 2018—three days after it began working on this lawsuit for Southern Visions and less than one hour before one of its lawyers appeared in this case. (Doc. # 85-1 at 7-8). Thus, Bradley was representing two clients directly opposed to one another in pending litigation for three days.

Under Rule 1.7(a), Bradley was permitted to undertake the Southern Visions representation only if two conditions were met. Taking those conditions in reverse order, Bradley was first required to obtain each client's consent "after consultation." Ala. R. Prof. Conduct 1.7(a)(2). Second, even assuming client consent, Bradley could not represent Southern Visions unless it "reasonably believe[d] the representation [would] not adversely affect" its relationship with Red Diamond. Ala. R. Prof. Conduct 1.7(a)(1). As explained below, the court concludes

that Red Diamond did not consent to Bradley's representation of Southern Visions "after consultation." And, in any event, whether or not Red Diamond consented to the representation, Bradley certainly could not have reasonably believed that suing Red Diamond for a substantial sum of money on behalf of Southern Visions would not adversely affect its relationship with Red Diamond. Bradley therefore failed to comply with both conditions of Rule 1.7(a) in accepting the Southern Visions representation.

### a. Bradley Did Not Obtain Red Diamond's Consent After Consultation to Represent Southern Visions

Bradley claims it complied with Rule 1.7(a)'s requirement of consent after consultation by having Red Diamond sign engagement letters at the outset of its prior representations of Red Diamond that contained advance conflict waivers. The advance waivers state that Red Diamond agreed that Bradley could undertake future representations of other clients "in any matter that is not substantially related" to Bradley's work for Red Diamond, "even if the interests of such clients in those other matters are directly adverse" to Red Diamond, and "even if such representations would be simultaneous." (Doc. # 76-1 at 10, 15, 26). Notwithstanding their broad language, the court does not believe these advance waivers permitted Bradley to undertake the Southern Visions representation, for two reasons: (1) Red Diamond never gave its consent "after consultation" to the Southern Visions representation, through the advance waivers or otherwise; and (2) even if Red Diamond had consented to Bradley's representation of Southern Visions, it unequivocally revoked that consent before Bradley began representing Southern Visions.

First, Rule 1.7(a) forbids concurrent conflicting representations unless each client consents "after consultation." The terms "consult" or "consultation" are defined in the Alabama Rules of Professional Conduct as denoting "communication of information reasonably sufficient to permit the client to appreciate the significance of the matter in question." Ala. R. Prof.

Conduct, Terminology. And, by using the term "after," Rule 1.7(a) requires client consent to occur *subsequent to* such a communication. This directive recognizes the reality that it is highly likely a client will not foresee and appreciate some future conflicts when asked to sign a generic advance waiver. In other words, Rule 1.7(a) requires lawyers to obtain *informed* consent from their clients before undertaking directly adverse representations. That did not happen here. Neither the advance waivers Red Diamond signed nor any communications Bradley had with Red Diamond after Southern Visions approached it about this case sufficed to provide the consent after consultation Rule 1.7(a) requires.

Turning first to the advance waivers, a number of courts have held that broad, open-ended advance conflict waivers like those Red Diamond signed are ineffective to provide consent to future conflicts. *See, e.g.*, *Lennar Mare Island, LLC v. Steadfast Ins. Co.*, 105 F. Supp. 3d 1100, 1118 (E.D. Cal. 2015) (finding generic advance waiver signed by a sophisticated client "too broad and too stale to cover the current conflict"); *W. Sugar Coop. v. Archer-Daniels-Midland Co.*, 98 F. Supp. 3d 1074, 1083-84 (C.D. Cal. 2015) (holding ineffective an "open-ended" conflict waiver signed by a sophisticated client that (1) purported to indefinitely waive conflicts in any matter not substantially related and (2) did not identify a potentially adverse client, the types of potential conflicts, or the nature of the potential future representations); *Celgene Corp. v. KV Pharm. Co.*, No. 07-4819SDW, 2008 WL 2937415, at *8-10 (D.N.J. July 29, 2008) (same). Open-ended advance conflict waivers are especially suspect where a lawyer seeks to rely on them to provide effective consent to directly adverse litigation between current clients. As one court in this Circuit put it:

> [F]uture directly adverse litigation against one's present client is a matter of such an entirely different quality and exponentially greater magnitude, and so unusual given the position of trust existing between lawyer and client, that any document intended to grant standing consent for the lawyer to litigate against his own client

must identify that possibility, if not in plain language, at least by irresistible inference including reference to specific parties, the circumstances under which such adverse representation would be undertaken, and all relevant like information.

*Worldspan, L.P. v. Sabre Grp. Holdings, Inc.*, 5 F. Supp. 2d 1356, 1360 (N.D. Ga. 1998).

Another way of stating this principle is to say that a court will not lightly conclude that a client's advance conflict waiver was truly intended to permit the law firm to later sue that current client on behalf of another—not without clear evidence of such intent. The rationale behind this clear-statement rule is the idea that some conflicts -- like suing a current client -- so break the bonds of trust between client and lawyer that it is highly unlikely a client would knowingly and voluntarily consent in advance to such a conflict. Indeed, the RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS (which the court recognizes is only persuasive authority) endorses this idea by prohibiting lawyers from suing a current client *even with* the client's informed consent. *See* § 122(2) ("Notwithstanding the informed consent of each affected client or former client, a lawyer may not represent a client if . . . *one client will assert a claim against the other* in the same litigation.") (emphasis added). While that guidance is in no way binding, it is informative.

Bradley responds that Red Diamond's advance waivers were effective because Red Diamond is a sophisticated consumer of legal services and should have understood that signing the waivers would permit Bradley to later sue it on behalf of another client. In support of this argument, Bradley cites a comment in the RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS which provides, "A client's open-ended agreement to consent to all conflicts normally should be ineffective *unless the client possesses sophistication in the matter in question* and has had the opportunity to receive independent legal advice about the consent." § 122, cmt. d (emphasis added). But Bradley fails to note that the same section of the RESTATEMENT it cites—the text, not the comment—expressly forbids the very representation Bradley undertook, *even*

15

*when a client gives informed consent*. *See* § 122(2) ("Notwithstanding the informed consent of each affected client or former client, a lawyer may not represent a client if . . . one client *will assert a claim against the other* in the same litigation.") (emphasis added). Thus, at least in the view of the commentators, whatever else sophisticated parties may provide advance consent to under § 122, they cannot consent in advance—or ever—to their own lawyers suing them on behalf of another client.

In light of these authorities, the court concludes that Red Diamond did not effectively consent after consultation to Bradley representing Southern Visions in this lawsuit through the advance waivers it signed. To be clear, the court stops short of holding that advance conflict waivers are never effective to provide the consent "after consultation" that Rule 1.7(a) requires. Had Bradley's advance waivers used specific language to identify the types of potential future conflicts it had in view, and were there evidence in the record showing that Red Diamond had been fully counseled about the matter before signing the waiver and perhaps even advised to seek independent legal counsel, a different result might well obtain. *See* 1 Geoffrey C. Hazard, Jr., et al., The Law of Lawyering §§ 11.09, 12.36 (4th ed. 2014 & Supp. 2018-2). But, given the advance waivers' lack of specificity, the lack of evidence that Red Diamond was fully counseled regarding their import, and especially the fact that directly adverse litigation between two direct competitors like Red Diamond and Southern Visions is an extremely serious conflict most clients would be unwilling to waive, the court is unable to conclude that the advance waivers, standing alone, provided Red Diamond's effective consent to this conflict.

Further, the court acknowledges that just because the advance waivers alone were insufficient to provide Red Diamond's consent to this conflict does not mean Bradley could not have later obtained it. Where a client has signed a generic advance waiver like those Red

Diamond signed, Rule 1.7(a)'s requirement of consent "after consultation" may be satisfied by consulting with the client "after" a new conflict has arisen and obtaining the client's informed consent to the new conflict at that time. Here, Bradley could have consulted with Red Diamond about the possibility of representing Southern Visions in this case *before* undertaking representation of Southern Visions, and asked Red Diamond to waive the conflict. But that is not what Bradley did.

There is no evidence Bradley consulted with Red Diamond about its decision to represent Southern Visions, and it certainly never obtained Red Diamond's consent to the representation after consultation. Rather, Red Diamond first learned that Bradley might be suing it on behalf of Southern Visions when a Bradley lawyer contacted Red Diamond's counsel in this case about an entirely separate potential conflict. On December 19, 2018, Bradley attorney Matthew Lembke called Lightfoot attorney Harlan Prater (Red Diamond's counsel in this litigation) to determine whether his legal assistant, who had previously worked for Prater, had obtained confidential information about this case. (Doc. # 85-2 at ¶¶ 8-9). If she had, Lembke wanted to know whether Red Diamond would consent to an ethical screen around the legal assistant to cure any conflict. (*Id.*).

At the hearing, counsel for Red Diamond represented that this was the first time Red Diamond learned Bradley was considering representing Southern Visions. Based on the hearing testimony and the parties' submissions, the court finds that Bradley did not consult with Red Diamond or ask Red Diamond to waive the Rule 1.7(a) conflict that would be created by simultaneous representation of directly adverse clients before accepting the Southern Visions representation. Instead, Bradley planned to rely solely on the advance conflict waivers in Red Diamond's prior engagement letters as the basis for saying Red Diamond consented to this

conflict. (Doc. # 76-1 at 33).[2] The court finds in this instance that Bradley's reliance on the open-ended advance waivers alone, without any subsequent consultation or request for consent from Red Diamond regarding the current conflict, did not satisfy Rule 1.7(a)'s requirement of consent "after consultation."

Second, even if Red Diamond were deemed to have consented to Bradley's representation of Southern Visions through the advance waivers or otherwise, it unequivocally revoked that consent on December 21, 2018, *before* Bradley began representing Southern Visions. (Doc. # 76-1 at 33-34). Bradley concedes that Red Diamond was absolutely within its rights to revoke any consent it had previously given to Bradley's conflicting representation of Southern Visions. (Doc. # 85 at 21) (citing ABA Model R. Prof. Conduct 1.7, cmt. 21). Once Red Diamond revoked its consent on December 21, there was absolutely no doubt that Bradley was prohibited under Rule 1.7(a) from undertaking representation of Southern Visions in this lawsuit while simultaneously representing Red Diamond in other matters. Yet, that is exactly what Bradley did. It began representing Southern Visions on December 23 and did not withdraw from representation of Red Diamond until December 26.

Because of Red Diamond's December 21 email, Bradley knew Red Diamond did not consent to its representation of Southern Visions when it began representing Southern Visions on December 23. That alone is sufficient to show a violation of Rule 1.7(a). But in the alternative -- even if Red Diamond were deemed to have effectively consented after consultation to Bradley's

---

[2] At the hearing, counsel for Red Diamond indicated that William Bowron had some communications with Bradley by telephone between December 19 and December 21 that led him to understand that Bradley planned to rely on the advance waivers Red Diamond had signed to provide consent to Bradley's representation of Southern Visions. At most these phone communications constituted notice to Red Diamond that Bradley believed Red Diamond had already consented to the Southern Visions representation. The evidence in the record does not support the conclusion that these phone communications constituted a request for consent "after consultation," as Rule 1.7(a) requires. And in any event, Bradley certainly did not *obtain* Red Diamond's consent after consultation before it began representing Southern Visions on December 23. (*See* Doc. # 76-1 at 33-34). Bowron's December 21 email to Bradley made it abundantly clear that Red Diamond did not consent to the conflict. (*Id.*).

representation of Southern Visions by virtue of the advance waivers or otherwise -- Bradley still failed to comply with Rule 1.7(a)'s second requirement, as explained below.

### b. Bradley Could Not Have Reasonably Believed That Representing Southern Visions in This Case Would Not Adversely Affect Its Relationship with Red Diamond

To accept a representation that pits a new client against one of the firm's current clients, a law firm must -- in addition to obtaining client consent after consultation -- reasonably believe the new representation will not adversely affect its relationship with its existing client. Ala. R. Prof. Conduct 1.7(a)(1). The Comment to Rule 1.7 further explains this requirement: "[W]hen a disinterested lawyer would conclude that the client should not agree to the representation under the circumstances, the lawyer involved cannot properly ask for such agreement or provide representation on the basis of the client's consent." Ala. R. Prof. Conduct 1.7, cmt.

There is no doubt that a disinterested lawyer would not have advised Red Diamond to permit Bradley to sue it in a major patent infringement case while simultaneously representing it in other matters. Such advice would run directly contrary to the duty of undivided client loyalty that forms the basis of Rule 1.7. *See* Ala. R. Prof. Conduct 1.7, cmt ("Loyalty is an essential element in the lawyer's relationship to a client."). It would also run counter to common sense—rare is the client who is willing to pay a law firm handsome (or, as may be the case here, even modest) legal fees to handle certain matters while the same firm works diligently to extract a substantial award of damages from the client in another matter.

Moreover, Red Diamond's actions once it learned Bradley was considering representing Southern Visions left no room for a reasonable belief that representing Southern Visions would not adversely affect Bradley's relationship with Red Diamond. In his email on December 21, 2018, Red Diamond CEO William Bowron made clear that he was "frankly shocked" Bradley

believed it could sue Red Diamond while continuing to represent it in other matters. (Doc. # 76-1 at 33). He also stated that he viewed Bradley's attempt to represent Southern Visions as nothing "less than a violation of the trust" he placed in Bradley. (*Id.* at 34). Even if Red Diamond's advance waivers could be deemed effective (which, in light of Bradley's lack of consultation, they cannot), Bradley could not under these circumstances have reasonably believed that representing Southern Visions would not adversely affect its relationship with Red Diamond. *See Ex parte Osbon*, 888 So. 2d at 1238-39 (holding that two law firm partners who represented opposing parties in a subpoena dispute could not reasonably have believed their relationships with their clients would not be adversely affected by their respective positions). Bradley's decision to begin representing Southern Visions on December 23, 2018 -- before terminating its attorney-client relationship with Red Diamond -- violated Rule 1.7(a).

In a situation like the one Bradley found itself in -- with a new, potentially lucrative client asking it to sue one of its current, albeit minor, clients -- what should a law firm do? The Alabama Rules of Professional Conduct provide clear guidance. Where "[a]n impermissible conflict of interest" exists "before representation is undertaken," "the representation should be declined." Ala. R. Prof. Conduct 1.7, cmt. Thus, faced with a concurrent conflict under Rule 1.7(a), Bradley had two permissible options under the Rules. Under Rule 1.16(a)(1), Bradley could have declined to represent Southern Visions because the representation would "result in violation of the Rules of Professional Conduct." Alternatively, under Rule 1.16(b), Bradley could have withdrawn from representing Red Diamond *before* accepting the Southern Visions representation—if it could do so "without material adverse effect" on Red Diamond's interests, or if other good cause for withdrawal existed. After withdrawing from representation of Red Diamond, Bradley would have been free to represent Southern Visions if not prohibited by Rule

1.9 or another rule. What Bradley could not do is exactly what it did: decide to court Southern Visions as a potential client on December 21, 2018, then accept representation of Southern Visions on December 23 (all without consulting or obtaining consent from its directly adverse current client), and then, once the new client was landed, begin work for it immediately before finally dropping Red Diamond three days later.

### 2. Bradley's Arguments in Response Are Unpersuasive

Bradley has two primary arguments in response to Red Diamond's claim that it violated Rule 1.7(a) when it began representing Southern Visions. Neither of them is persuasive.

*First*, Bradley argues there was no Rule 1.7 violation because Red Diamond revoked its advance waivers on December 21, 2018, before Southern Visions became Bradley's client in this lawsuit. Bradley claims it would not have agreed to represent Red Diamond absent the advance waivers and that they were therefore a material term of Bradley's contract to represent Red Diamond. Under general contract-law principles, Bradley argues, Red Diamond's unilateral modification of a material contract term effectively terminated Bradley's contract with Red Diamond, freeing Bradley to accept the Southern Visions representation. This argument is flawed for two reasons.

As an initial matter, and as noted above, the advance waivers are ineffective to provide consent to *this* conflict of interest. An unenforceable or ineffective contract term, by definition, cannot be a material contract term. Moreover, because the waivers were ineffective to provide consent to this conflict, it was actually *Bradley*, not Red Diamond, who sought to unilaterally modify a key default term governing the attorney-client relationship—namely, that a law firm will not later sue its client without consultation and consent or, at the very least, without first terminating the attorney-client relationship.

Further, and more fundamentally, though an attorney-client relationship often includes a contractual element, it is not *merely* a contractual relationship. The case Bradley cites for the proposition that the attorney-client relationship "is a matter of contract," *Bd. of Comm'rs of Alabama State Bar v. Jones*, 281 So. 2d 267, 273 (1973), illustrates this point. In *Jones*, the Alabama Supreme Court said that "a contract of employment between the attorney and the client" was *necessary* "to create an attorney-client relationship." *Id.* That is certainly true in most cases (putting aside for the moment pro bono representations). But *Jones* did not purport to say that an attorney-client relationship is *only* a contractual relationship—and for good reason. After all, it is well-settled that lawyers have certain duties to their clients that other contracting parties simply do not owe their contractual partners. *See* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 34, cmt. b (because "[l]awyers usually encourage their clients to trust them," they "owe their clients greater duties than are owed under the general law of contracts"). One of those additional duties is a duty of loyalty that precludes lawyers from suing a current client—even if the lawyer thinks the client has breached a term of their employment contract. The court understands that such a duty of loyalty does not prevent the lawyer from terminating the attorney-client relationship -- if it can be done in a manner consistent with Rule 1.16(b) -- and *then* suing the (now) former client (if not prohibited by other relevant ethical rules). But the duty of loyalty does prevent a lawyer from treating a current client like a former client before formally ending the attorney-client relationship, simply because the lawyer believes the client breached their contractual agreement. Yet, that is precisely what occurred here.

*Second*, at the hearing, Bradley argued it should not be found to have violated Rule 1.7 because the Alabama Supreme Court has stated that the Rules of Professional Conduct are "rules of reason" that require a "common sense" approach to evaluating professional conduct, and that

a law firm faced with a concurrent conflict of interest under Rule 1.7(a) "may avoid disqualification by moving swiftly to withdraw from its representation of a client." *Ex parte AmSouth Bank, N.A.*, 589 So. 2d 715, 719, 722 (Ala. 1991). Though Bradley concedes it began representing Southern Visions on December 23, 2018 -- three days before it terminated Red Diamond -- it contends it acted reasonably under the circumstances and "mov[ed] swiftly" to withdraw from representing Red Diamond by sending an email on December 26, the next business day following its decision to represent Southern Visions. *Id.* at 722. Contrary to Bradley's assertions, however, *AmSouth* provides no support for its position.

In *AmSouth*, the law firm Arnold & Porter had a Rule 1.7(a) conflict of interest thrust upon it by the actions of its own client. Arnold & Porter represented AmSouth Bank in certain banking and corporate matters, and it also represented Drummond Company in an unrelated stockholder lawsuit challenging Drummond's conduct during a merger. *AmSouth*, 589 So. 2d at 716. AmSouth then later (through another law firm) also sued Drummond based on Drummond's conduct during the merger. *Id.* at 716-17. When Arnold & Porter realized that -- through no fault of its own -- it was now representing AmSouth in corporate matters while simultaneously defending Drummond in the AmSouth v. Drummond lawsuit, it asked both clients to waive the conflict. *Id.* at 17. Drummond agreed to waive the conflict, but AmSouth refused. *Id.* Arnold & Porter therefore promptly withdrew from representing AmSouth in the unrelated corporate matters and continued defending Drummond in the AmSouth v. Drummond lawsuit. *Id.* AmSouth then moved to disqualify Arnold & Porter from representing Drummond in the AmSouth v. Drummond lawsuit. *Id.*

In holding that Rule 1.7(a) did not require Arnold & Porter's disqualification from representing Drummond, the Alabama Supreme Court placed great emphasis on the fact that

Arnold & Porter "did not *by its own actions* create the conflict of interest" and that "Drummond would be prejudiced more than AmSouth" by the loss of Arnold & Porter's services. *Id.* at 719, 722 (emphasis added). It was in this context that the court called the Rules of Professional Conduct "rules of reason" requiring a "common sense" approach—and concluded that the Rules did not, in this case, require Arnold & Porter to withdraw from representing Drummond. *Id.* But the court expressly made clear that it was *not* endorsing the view that a law firm should "be allowed to abandon its absolute duty of loyalty to one of its clients so that it can benefit from a conflict of interest that *it has created*." *Id.* at 721 (emphasis added). Instead, the court adopted the approach of several other courts, which had "recognized that the manipulation of client relationships could be the potential result if law firms were allowed to discard one attorney-client relationship in contemplation of pursuing a more beneficial, conflicting representation." *Id.* at 721-22. Under that approach, where a law firm has a Rule 1.7(a) conflict involuntarily thrust upon it, the law firm "may avoid disqualification by moving swiftly to withdraw from its representation of a client, so as to minimize the prejudice to each client concerned, *provided that the law firm did not play a role originally in creating the conflict of interest*." *Id.* (emphasis added). "[T]his approach," adopted by the Alabama Supreme Court in *AmSouth*, was "consistent with the 'common sense' approach" the court had long used in "resolving questions under the Rules of Professional Conduct." *Id.*

In undertaking the Southern Visions representation, Bradley did precisely what the *AmSouth* court refused to condone—it "abandon[ed] its absolute duty of loyalty to [Red Diamond] so that it [could] benefit from a conflict of interest" it created by its own actions. *Id.* at 721. The court has adopted the Alabama Rules of Professional Conduct but is not bound to follow the Alabama Supreme Court's interpretation of those Rules. *See Clark*, 2001 WL

24

34394281, at *5 n.1. Nevertheless, this court fully understands the *AmSouth* court's observation that the Rules of Professional Conduct are "rules of reason" that must be given a "common sense" construction. *AmSouth*, 589 So. 2d at 719. But that does not mean giving them a construction that would permit Bradley to avoid a clear Rule 1.7(a) violation in this case. Such a construction of the Rules would be manifestly *un*reasonable. It would be contrary to the plain text of the Rules (as well as the Comments to the Rules) and relevant state authority (like *AmSouth*). And it would contravene the common-sense principle that a law firm, particularly a large, sophisticated one like Bradley, should not be excused -- even for three days -- from violating the most basic conflict-of-interest commandment: Thou shalt not sue one current client on behalf of another. That is all the more true given that Bradley could very easily have avoided creating this conflict of interest in the first place, either by simply declining to represent Southern Visions or -- if permissible under Rule 1.16(b) -- terminating its relationship with Red Diamond before agreeing to represent Southern Visions.

For all these reasons, the court concludes that Bradley violated Rule 1.7(a) when it began representing Southern Visions in this case on December 23, 2018.

### B.    Disqualification is Warranted

Having concluded that Bradley violated Rule 1.7(a), the court must decide whether that violation warrants disqualification from representing Southern Visions in this case. In doing so, the court considers both binding Eleventh Circuit precedent regarding disqualification of counsel and persuasive authority from other federal courts.

#### 1.    Eleventh Circuit Precedent

The Eleventh Circuit has identified two different lines of authority governing whether attorneys generally admitted to practice before a district court may be disqualified from a

particular case.[3] *See Schlumberger*, 113 F.3d at 1560-61. One line of authority governs situations involving unethical conduct that threatens to disrupt the orderly administration of justice or is a deliberate challenge to the authority of a district court. *Id.* at 1561. Those cases have involved in-court misconduct by attorneys, *id.* (collecting cases), counsel deliberately advising a client to disobey a court order, *id.* (citing *Kleiner v. First Nat. Bank of Atlanta*, 751 F.2d 1193, 1207 (11th Cir. 1985) as an example), or alleged attempts by counsel to manipulate the random assignment of judges to a case, *In re BellSouth Corp.*, 334 F.3d 941, 959-60 (11th Cir. 2003). In those cases, the Eleventh Circuit "give[s] great deference to a trial court's decision to disqualify the responsible attorney." *Schlumberger*, 113 F.3d at 1561. This case does not involve misconduct of that sort, however, and the court concludes that line of authority is therefore inapplicable.

A second line of authority governs situations where "the conduct at issue does not threaten the orderly administration of justice" but nonetheless crosses an ethical line. *Id.* In that class of cases, the Eleventh Circuit "insist[s] that district courts rest their disqualification decisions on the violation of specific Rules of Professional Conduct, not on some transcendental code of conduct that exists only in the subjective opinion of the court." *Id.* (cleaned up). It is this second line of authority which governs this case.

---

[3] Yet a third standard governs a district court's decision whether to admit a *pro hac vice* applicant who is in good standing with a state bar: "Absent a showing of unethical conduct rising to a level that would justify disbarment, the court *must* admit the attorney." *Schlumberger*, 113 F.3d at 1561 (emphasis in original). But because this case does not involve a "pre-trial motion for admission *pro hac vice*," *id.*, that standard is inapplicable here.

The Eleventh Circuit and old Fifth Circuit have also imposed certain procedural requirements, including notice and an opportunity to respond, before a district court may deny or revoke *pro hac vice* status or disqualify an attorney for lying on the witness stand. *See In re Evans*, 524 F.2d 1004, 1008 (5th Cir. 1975) (denial of *pro hac vice* admission); *Kirkland v. Nat'l Mortg. Network, Inc.*, 884 F.2d 1367, 1368-72 (11th Cir. 1989) (revocation of *pro hac vice* admission); *Kleiner v. First Nat. Bank of Atlanta*, 751 F.2d 1193, 1211 (11th Cir. 1985) (disqualification for lying on stand). None of those circumstances is at issue here, however. And in any event, Bradley was afforded notice and an opportunity to be heard, including briefing and a lengthy hearing, on the issues presented in Red Diamond's disqualification motion.

Under this second line of authority, the Eleventh Circuit has routinely affirmed disqualification orders in civil cases[4] where the district court properly found counsel violated an applicable ethical rule. *See Miccosukee Tribe of Indians*, 686 F. App'x at 825-26 (affirming disqualification order because district court properly found violation of applicable rule of professional conduct, and, alternatively, because any error in that finding was harmless); *McGriff*, 477 F. App'x at 677-79 (affirming disqualification order where district court properly found violation of applicable rules of professional conduct); *Herrmann*, 199 F. App'x at 747, 755-57 (same); *Banque de Rive*, 758 F.2d at 561 (same).

Applying this same principle, the Eleventh Circuit has reversed or vacated disqualification orders where the district court either did not find a specific violation of an applicable ethical rule or erroneously concluded that a rule violation occurred. *See In re Thompson*, No. 06-12375-F, 2006 WL 1598112, at *2 (11th Cir. June 7, 2006) (granting partial mandamus relief and directing district court to reconsider its disqualification order where district court clearly erred in applying the relevant ethical rule); *In re Finkelstein*, 901 F.2d 1560, 1565 (11th Cir. 1990) (reversing order suspending attorney from practice because suspension order was not based on a violation of any applicable ethical rule, but only on the court's subjective opinion that counsel violated a "transcendental code of conduct" of which counsel had no notice); *Cox v. Am. Cast Iron Pipe Co.*, 847 F.2d 725, 729-30, 731-32 (11th Cir. 1988) (reversing disqualification order where district court (1) never mentioned either of the applicable ethical rules in its memorandum opinion, (2) erroneously failed to recognize that party seeking disqualification had waived its right to object to one rule violation, and (3) erroneously concluded that the other rule was in fact violated); *Norton v. Tallahassee Mem'l Hosp.*, 689 F.2d

---

[4] The court does not consider precedents addressing disqualification orders in criminal cases, which apply a different standard under the Sixth Amendment. *See, e.g.*, *United States v. Ross*, 33 F.3d 1507, 1522-24 (11th Cir. 1994); *United States v. Hobson*, 672 F.2d 825, 826-29 (11th Cir. 1982).

938, 940-42 (11th Cir. 1982) (reversing disqualification order where district court made erroneous factual findings and erroneously concluded that counsel violated ethical rule); *Woods v. Covington Cty. Bank*, 537 F.2d 804, 812-19 (5th Cir. 1976) (reversing disqualification order where district court erroneously concluded that attorney had violated ethical rule).

The Eleventh Circuit's cases addressing disqualification orders are simply of no help to Bradley. They uniformly indicate that disqualification from a particular case is an appropriate sanction where counsel has violated a specific rule of professional conduct applicable in the relevant jurisdiction, of which counsel had notice. That is exactly what Bradley did in this case.

The Eleventh Circuit's precedents addressing district court orders *denying* motions to disqualify are also of no help to Bradley. There are three potentially relevant decisions in this category, but none of them suggest that disqualification is inappropriate here.

In *Waters v. Kemp*, a district court appointed two lawyers from a Georgia law firm to serve as local counsel for a federal habeas petitioner challenging a prior state conviction. 845 F.2d 260, 261 (11th Cir. 1988). The Attorney General of Georgia, who represented the respondent, moved to disqualify the lawyers from representing petitioner because another partner at their law firm, Robert Glenn, was then serving as a special assistant attorney general of Georgia. *Id.* at 261-62, 264. The attorney general's theory was that Glenn was a member of the attorney general's "law firm"; that, in essence, he was a member of the "Georgia Department of Law." *Id.* at 264. Glenn could not have represented petitioner under the concurrent conflict of interest rule, since other members of the state's Law Department represented the respondent. *Id.* And because Rule 1.10 imputes a lawyer's conflicts to all the other lawyers at his firm, the other members of Glenn's private law firm were prohibited from representing petitioner on the basis of Glenn's conflict. *Id.* So the attorney general argued.

The district court denied the motion to disqualify, and the Eleventh Circuit affirmed. *Id.* at 262, 266. The Eleventh Circuit concluded that the key factual premise of the attorney general's argument was false: for purposes of the conflict of interest rules, Glenn was *not* a member of attorney general's "law firm" by virtue of his role as a special assistant attorney general. *Id.* at 264. The court reached that conclusion because Georgia law explicitly permitted special assistant attorneys general like Glenn to undertake representations adverse to the state. *Id.* The court also noted that "Glenn's membership in and obligation to the attorney general's law firm [was] extremely limited." *Id.* Under these facts, the court found that representation of petitioner by Glenn's law firm simply created "no conflict of interest," and disqualification was therefore not appropriate. *Id.* at 263. *Waters* thus confirms the principle discussed above: disqualification is appropriate only where counsel has in fact violated a specific ethical rule, of which counsel had notice. That did not occur in *Waters*. But it is exactly what occurred in this case.

The next two cases both involve circumstances remarkably similar to the situation in *AmSouth*, 589 So. 2d at 716-17, in which a law firm had a concurrent conflict of interest thrust upon it through no fault of its own. *See Bayshore Ford Truck Sales, Inc. v. Ford Motor Co.*, 380 F.3d 1331, 1334-35 (11th Cir. 2004); *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1498 (11th Cir. 1989). In both *Bayshore* and *Tipton*, as in *AmSouth*, a plaintiff who had retained a law firm to represent it in one matter subsequently sued a defendant in an unrelated matter who, as it happened, was also represented by that same law firm. *Bayshore*, 380 F.3d at 1334; *Tipton*, 872 F.2d at 1498. In both cases, when the law firm discovered the conflict, it acted promptly to withdraw from representing the plaintiff in the unrelated matter and continued representing the defendant. *Bayshore*, 380 F.3d at 1334; *Tipton*, 872 F.2d at 1498. Critically, in

neither case did the law firm create the concurrent conflict by its own actions, and in neither case had the law firm obtained relevant confidential information about the plaintiff through the unrelated representation. *Bayshore*, 380 F.3d at 1334; *Tipton*, 872 F.2d at 1498. Under those facts, the Eleventh Circuit affirmed the district courts' orders denying the plaintiffs' disqualification motions. *Bayshore*, 380 F.3d at 1338-40; *Tipton*, 872 F.2d at 1499.

*Bayshore* and *Tipton* are thus of no more help to Bradley than is *AmSouth*. All three of those cases are critically different from this one by virtue of the fact that Bradley knowingly created a conflict of interest, without consultation or consent from Red Diamond, that it could easily have avoided simply by declining to represent Southern Visions or by withdrawing from its representation of Red Diamond before engaging Southern Visions.

In short, Eleventh Circuit case law imposes a straight-forward standard for evaluating motions to disqualify like Red Diamond's: disqualification is appropriate if the district court finds a violation of a specific rule of professional conduct, of which counsel had notice. *Schlumberger*, 113 F.3d at 1561. On the other hand, disqualification is not appropriate if the alleged ethical violation merely involves the transgression of some transcendental code of conduct that exists only in the subjective opinion of the court. *Id.* Here, the ethical violation on which Red Diamond's disqualification motion is based is clearly of the former type, not the latter, and disqualification is therefore appropriate.

Having said all that, although the general standards governing attorney disqualification announced by the Eleventh Circuit clearly permit Bradley's disqualification, the court's research suggests that the Eleventh Circuit has never confronted a Rule 1.7(a) violation in circumstances like those presented here, where the law firm created the conflict by its own actions but then

eliminated the conflict by firing one of its clients a short time later. The court therefore turns to other federal cases as persuasive authority on the issue.

### 2. Other Persuasive Authority

There are two divergent lines of federal authority on the question of when a Rule 1.7(a) violation warrants disqualification of counsel. One line of authority adopts a per se rule, holding that knowing violations of Rule 1.7(a) always warrant disqualification. Another line of authority weighs various factors in considering whether a Rule 1.7(a) violation warrants disqualification. The court has studied both lines of authority and concludes that, under either one, disqualification is warranted in this case.

### a. The Per Se Line of Authority

Some federal courts have held that when a party's counsel violates Rule 1.7(a), especially by suing a current client, counsel should be automatically disqualified. *See, e.g.*, *Manoir-Electroalloys Corp. v. Amalloy Corp.*, 711 F. Supp. 188, 195 (D.N.J. 1989) ("Because the interest sought to be protected by Model Rule 1.7 is one of loyalty, a per se rule of disqualification should be applied when that rule is breached."); *Schiffli Embroidery Workers Pension Fund v. Ryan, Beck & Co.*, No. CIV. A. 91-5433, 1994 WL 62124, at *5 (D.N.J. Feb. 23, 1994) (same); *Parallel Iron, LLC v. Adobe Sys. Inc.*, No. CA 12-874-RGA, 2013 WL 789207, at *4 (D. Del. Mar. 4, 2013) (same); *Int'l Bus. Machines Corp. v. Levin*, 579 F.2d 271, 279 (3d Cir. 1978) ("If the facts found by the district court establish that practitioners before it have acted in a way which disqualifies them under its rules and established standards of professional conduct, it would ordinarily be error for the court to fail to declare the disqualification.").

These courts and others have adopted a per se rule of disqualification when a firm sues its current client for two primary reasons. First, a per se rule vindicates "the duty of undivided loyalty which an attorney [or law firm] owes to each of [their] clients" and deters violations of that duty. *Levin*, 579 F.2d at 280 (internal quotation marks omitted). The duty of loyalty mandated by Rule 1.7(a) simply cannot be enforced, nor violations of the rule be effectively deterred, unless courts disqualify lawyers and law firms who violate the rule. Second, a per se rule has the "salutary effect of promoting public confidence in the integrity of the bar and the judicial system." *Manoir-Electroalloys*, 711 F. Supp. at 196 (spelling error corrected); *see also Levin*, 579 F.2d at 283 ("An attorney who fails to observe his obligation of undivided loyalty to his client injures his profession and demeans it in the eyes of the public."). In other words, a per se rule allows clients to be confident that their lawyers will not suddenly turn on them, at least not without first obtaining their consent or terminating the attorney-client relationship.

If courts instead require clients to show something beyond a knowing violation of Rule 1.7(a) to obtain disqualification, such as a likelihood that their lawyers obtained confidential information that can now be used against them, many clients will be unable to enforce the protection Rule 1.7(a) affords them. This case is a perfect example: if a law firm sues its own client (or, as in this case, begins work against the client and appears in a case adverse to the client) in a matter unrelated to its other work for the client and then, when the client objects, simply fires the client, the client will have no recourse. Moreover, other rules of professional conduct already protect clients from the risks inherent in representations adverse to *former* clients. *See* Ala. R. Prof. Conduct 1.9 (forbidding lawyers from undertaking a representation adverse to a former client if the representation is substantially related to matters previously handled for the client or if the lawyer previously obtained confidential information that could be

used against the former client in the representation). But Rule 1.7(a) provides a special protection to *current* clients not offered by the other rules: a duty of undivided loyalty owed by a lawyer to his client. That special protection is arguably given meaningful force only when accompanied by a per se rule of disqualification for knowing violations of the rule.

The court finds the rationale supporting a per se rule of disqualification for violations of Rule 1.7(a) persuasive, particularly in cases (like this one) where the law firm created the conflict by its own actions and could easily have avoided the conflict. But the court stops short of adopting that rule. Indeed, it need not decide whether a per se rule is appropriate because, as explained below, disqualification is still warranted here even under a more lenient "rule of reason" approach.

### b.    The Rule-of-Reason Line of Authority

Some federal courts have held that disqualification is not always an appropriate sanction for violations of Rule 1.7(a). *See SWS Fin. Fund A v. Salomon Bros. Inc.*, 790 F. Supp. 1392, 1399-1403 (N.D. Ill. 1992); *Gould, Inc. v. Mitsui Min. & Smelting Co.*, 738 F. Supp. 1121, 1126 (N.D. Ohio 1990). The leading case in this line of authority, *SWS Financial Fund A*, recognized that its approach "may be viewed by some as a departure from the norm" and that "[m]any courts, having determined that a conflict of interest exists, will automatically disqualify." 790 F. Supp. at 1403. The court's review of the federal case law on the issue confirms that the flexible "rule of reason" approach to deciding whether a Rule 1.7(a) violation warrants disqualification appears to be the minority approach. Still, even under this more lenient minority approach, disqualification is clearly warranted on the facts of this case.

Under the rule-of-reason approach, courts balance the costs of disqualification against the interests Rule 1.7(a) seeks to protect by considering several factors. First, courts ask whether the

client seeking disqualification will be prejudiced by the adverse representation. *Gould*, 738 F. Supp. at 1126. Prejudice may include, for example, the fact that the client's law firm obtained confidential information from prior representations relevant to the current dispute. *Id.* Second, courts ask whether disqualifying counsel would impose significant costs on the party who must retain new counsel or would significantly delay the progress of the case. *Id.* at 1126-27; *SWS Fin. Fund A*, 790 F. Supp. at 1400-01. Third, courts consider whether counsel created the conflict of interest by their own actions or whether the conflict was instead thrust upon them through no fault of their own. *Gould*, 738 F. Supp. at 1127. Here, the court finds that the balance of these factors weigh in favor of disqualifying Bradley from representing Southern Visions in this lawsuit.

The first factor, prejudice, is the one that weighs least in favor of disqualification. At least on their face, the matters in which Bradley previously represented Red Diamond -- divorce proceedings, employee benefits matters, tax audits, and debt-collection matters -- bear little relation to the current patent-infringement lawsuit, and likely would not give Bradley a material advantage against Red Diamond in this case. However, Bradley's representation of Southern Visions is not entirely without risk of prejudice to Red Diamond. As Red Diamond's counsel pointed out at the hearing, Southern Visions and Red Diamond are direct competitors in the tea business. Red Diamond has submitted sealed depositions transcripts for *in camera* review showing that in prior representations Bradley obtained sensitive information about Red Diamond's board of directors, director fees, distributions to owners, ownership interests in the company, shareholder voting rights, audits, facilities, income, loans and guarantees, family trusts, corporate structure, operating divisions, annual reports, customer identities, company expenses, employee salaries, charitable giving, and other financial information including debt,

liabilities, total cost of goods sold, and total sales. That information, in the hands of Southern Visions, could be used to Red Diamond's disadvantage in the marketplace even if not in this patent dispute, thereby prejudicing Red Diamond.

However, the court is aware that Bradley has implemented an ethical screen between the lawyers who previously worked on Red Diamond matters and the lawyers who are now working on the Southern Visions case. (Doc. # 85-1 at ¶ 15). The court is confident Bradley would abide by that ethical screen to mitigate the risk that any confidential information Bradley obtained about Red Diamond would make its way into the hands of Southern Visions. For this reason, the court finds that the prejudice factor does not weigh strongly in favor of disqualification. However, the same cannot be said of the other factors.

The second factor, the cost to Southern Visions of having to retain new counsel and the risk of significantly delaying the litigation, weighs strongly in favor of disqualification. Unlike many cases that have declined to disqualify counsel for a Rule 1.7(a) violation, this is not a case "which has been pending for some time," *Gould*, 738 F. Supp. at 1124-25, or in which Bradley has "been deeply engaged in representing [Southern Visions] for a period of years," *El Camino Res., Ltd. v. Huntington Nat. Bank*, 623 F. Supp. 2d 863, 888 (W.D. Mich. 2007). *See also Norton*, 689 F.2d at 941 n.4 (declining to disqualify counsel where "extensive discovery and trial preparation [had already] been completed"). To the contrary, this case is in its very earliest stages. It was only recently filed and, since its initial filing, transferred to this court. In fact, Bradley only worked on the case for three weeks before the court stayed the litigation pending resolution of Red Diamond's disqualification motion. An answer, counterclaim, and a motion to dismiss the counterclaim have only just been filed, and discovery has not even commenced in earnest. Moreover, Southern Visions *already has* other counsel besides Bradley involved in the

case, and those lawyers have been in the case from its inception. Three lawyers from Atlanta law firms have ably handled the litigation thus far and may continue to do so, if Southern Visions desires, once Bradley is disqualified. Additionally, the court will provide Southern Visions with ample time to obtain new Birmingham counsel to represent it before lifting the stay, if Southern Visions so desires. In short, the cost to Southern Visions of retaining new counsel, should it choose to do so, is quite low. And the risk that obtaining substitute counsel will materially delay the litigation or hinder the adversarial process is practically nonexistent. Thus, this factor strongly supports disqualification.

The third factor, whether the law firm created the conflict of interest by its own actions or instead had a concurrent conflict thrust upon it through no fault of its own, also weighs strongly in favor of disqualification. It is important to remember that Bradley not only created the conflict itself by agreeing to represent Southern Visions against its current client, but also that Bradley (1) knew the conflict existed when it began courting Southern Visions and ultimately won its business, (2) knew that Red Diamond strenuously objected to the conflict, and (3) knew that it could have very easily avoided the conflict. Bradley ran a conflicts check on December 18, 2018 with Southern Visions as the potential client and Red Diamond as the adverse party, which would have shown that Red Diamond was a current client of Bradley's. (Doc. # 85-2 at ¶ 6). Indeed, a Bradley attorney had met with Red Diamond's Vice President of Finance just *six days* before, on December 12, to discuss the status of several pending debt collection matters Bradley was handling for Red Diamond. (Docs. # 76-2 at ¶¶ 4-5; 85-4 at ¶¶ 13-14). Despite knowing that Red Diamond was a current client of Bradley's, the firm agreed to attend a "beauty contest" with Southern Visions personnel on December 21, 2018, where it would seek to persuade Southern Visions to retain the firm's services in this pending lawsuit against Red Diamond. (Docs. # 85-2

at ¶ 11; 92-1 at ¶ 3; Hearing Testimony). At the end of that meeting, Southern Visions decided it wanted Bradley to represent it in this case. (Docs. # 85-2 at ¶ 11; 92-1 at ¶ 3).

During that December 21 meeting, Lembke, the lawyer from Bradley whom Southern Visions interviewed, learned that Red Diamond had earlier that day made emphatically clear that it did not consider itself to have consented to any conflict created by Bradley's representation of Southern Visions, and that Red Diamond revoked any such consent, effective immediately. (Docs. # 85-2 at ¶ 12; 76-1 at 33-34). Nevertheless, the firm proceeded to have its business review committee approve the Southern Visions representation two days later, on the morning of December 23. (Doc. # 92-1 at ¶ 4). Bradley began billing time on this lawsuit that same day. Critically, Bradley did not withdraw from representing Red Diamond in the debt collection matters or make clear its intent to terminate its attorney-client relationship with Red Diamond until three days later, on December 26, 2018. (Doc. # 85-1 at 7-8).

As these facts show, Bradley's violation of Rule 1.7(a), though brief, was not inadvertent. It was a knowing violation that could have been easily avoided—by declining the Southern Visions representation, by terminating its representation of Red Diamond earlier (preferably before it began courting Southern Visions on December 21, but at the very least before it began representing Southern Visions on December 23), or by delaying its representation of Southern Visions until after it withdrew from the Red Diamond matters it was handling. This is not a case "in which the conflict truly was unforeseeable and blind-sided the lawyer." *El Camino*, 623 F. Supp. 2d at 888. The opposite is in fact true. The third factor therefore strongly favors disqualification.

At the hearing, Bradley made much of the fact that the concurrent conflict of interest lasted for only a brief period of three days—December 23 (a Sunday), December 24 (Christmas

Eve), and December 25 (Christmas Day). Bradley also argued that its actions were reasonable in light of time-sensitive decisions that needed to be made in this litigation, such as whether to appeal from the district court's order denying Southern Visions' request for a preliminary injunction. A status conference also had already been scheduled for December 28, 2018 (Doc. # 59) when Southern Visions asked Bradley to accept the representation, and Bradley argued it needed time to prepare for the conference.

The court finds all of these arguments unpersuasive. As noted above, Southern Visions already had other counsel besides Bradley involved in the case. Those Atlanta-based lawyers were the ones who moved for a preliminary injunction on behalf of Southern Visions (Doc. # 9), and they should have been in an even better position than Bradley to decide whether an appeal should be taken. They also were up to speed on the case and could have ably represented Southern Visions' interests at the December 28 status conference. Indeed, since the conference was to occur by telephone (Doc. # 59), Southern Visions' Atlanta lawyers would not even have been required to travel to Birmingham for the conference. There was simply no pressing reason Bradley could not have withdrawn from Red Diamond earlier or delayed undertaking the Southern Visions representation for a few days. Instead, Bradley allowed the perceived litigation needs of a *prospective* client (which is all Southern Visions was prior to December 23) to trump the duty of loyalty it owed to its current client, Red Diamond. That is precisely what Rule 1.7(a) forbids.

Bradley asserts (Doc. # 85 at 19) that when considering whether to disqualify counsel based on a violation of a specific ethical rule, a district court in the Eleventh Circuit must balance the interests the Rules of Professional Conduct are designed to protect against a party's right to counsel of his choice. But in *Herrmann*, a panel of the Eleventh Circuit held that is not required.

*See* 199 F. App'x at 754 (observing that, where counsel has violated an applicable ethical rule, a "district court [is] not obligated to balance the plaintiffs' fundamental right to counsel against the interests sought to be protected by disqualification"). Instead, the decision whether to disqualify counsel when faced with a clear violation of a specific ethical rule is properly for the district court, keeping in mind -- as this court certainly does -- "that a motion to disqualify is a drastic measure." *Id.* Nevertheless, the court has balanced the relevant interests and concludes that they weigh strongly in favor of disqualifying Bradley from representing Southern Visions in this lawsuit.

The court is mindful that "[b]ecause a party is presumptively entitled to the counsel of his choice, that right may be overridden only if 'compelling reasons' exist." *BellSouth*, 334 F.3d at 961. As numerous Eleventh Circuit decisions make clear, however, a violation of an applicable rule of professional conduct is just such a "compelling reason." *See Miccosukee Tribe of Indians*, 686 F. App'x at 825-26; *McGriff*, 477 F. App'x at 677-79; *Herrmann*, 199 F. App'x at 747, 755-57; *Banque de Rive*, 758 F.2d at 561.

The court is also mindful that "[d]isqualification is a harsh sanction, often working substantial hardship on the client, especially in cases . . . where extensive discovery and trial preparation have been completed." *Norton*, 689 F.2d at 941 n.4. The court does not enter its disqualification order lightly. Rather, it concludes it is necessary to vindicate the important duty of client loyalty imposed on lawyers and law firms alike by the Alabama Rules of Professional Conduct. The court does take some comfort, however, in the fact that Southern Visions -- an innocent party in this matter -- will not be significantly prejudiced by the decision, given that little to no discovery has yet occurred and that Southern Visions currently has other lawyers besides Bradley representing it, who have performed most of the work in this case.

Finally, the court is also mindful of the Eleventh Circuit's instructions, which Bradley has called to its attention repeatedly, that a "court should not deprive an attorney of the opportunity to practice his profession on the basis of a determination after the fact that conduct is unethical if responsible attorneys would differ in appraising the propriety of that conduct." *Schlumberger*, 113 F.3d at 1562 (internal quotation marks omitted). The court notes that the Eleventh Circuit first made that statement in response to a district court's order *suspending* an attorney from the practice of law for six months. *Finkelstein*, 901 F.2d at 1563, 1565. The Eleventh Circuit later repeated the statement in the course of vacating a district court's order denying an attorney's *pro hac vice* application -- and therefore holding him unfit to practice before the district court -- where the district court never found that the attorney violated any specific ethical rules. *Schlumberger*, 113 F.3d at 1556-59, 1561. The Eleventh Circuit has, justifiably, imposed a very high bar before a district court may take that drastic step: "Absent a showing of unethical conduct rising to a level that would justify disbarment," a court "*must* admit" *pro hac vice* applicants who are in good standing with a state bar. *Id.* at 1561 (emphasis in original); *see also id.* at 1559. But this court is not suspending an attorney from practice or denying a *pro hac vice* application. Instead, the court's action is much more modest: Bradley may not represent this one client (Southern Visions) in this one lawsuit against Red Diamond, a party who was Bradley's current client when it undertook representation of Southern Visions.

Moreover, reasonable attorneys would not differ in appraising the propriety of Bradley's conduct. When a potential client asks a lawyer to consider suing one of his law firm's current clients, the lawyer's ethical duty under Rules 1.7 and 1.16 is clear: he must decline the representation, or the firm must withdraw from representing the current client (if the Rules so permit) before accepting the new representation. Rule 1.7(a) is a simple rule, and it is not

difficult to follow. Bradley clearly violated it by deciding to represent Southern Visions against Red Diamond before terminating its attorney-client relationship with Red Diamond.

One might object that disqualifying Bradley because it waited until December 26 to withdraw from representing Red Diamond, instead of withdrawing a few days earlier, is an exercise in arbitrary line drawing. But the line between current and former clients is one drawn by the Alabama Rules of Professional Conduct, and the court is not at liberty to redraw it. *See* Ala. R. Prof. Conduct 1.7 and 1.9. There is simply no getting around the fact that Red Diamond was a current client of Bradley's on December 23, when Bradley began representing Southern Visions against it. Moreover, this was not a difficult line for Bradley to walk. The Rules are clear about lawyers' obligations to their current clients and about the process by which lawyers may turn current clients into former clients. Bradley should have decided which representation it wished to pursue and then communicated promptly with its current client, Red Diamond, if it wished to end their attorney-client relationship. Only then would it have been free to engage Southern Visions as a client.

## IV.     Conclusion

The court does not ascribe Bradley's error in this case to any type of malice or chicanery. The court has always known the lawyers in this case to adhere to the highest ethical standards, and it is sure this is a one-off occurrence. Nevertheless, after careful review of the facts and the relevant authorities, the court is convinced that disqualification is an appropriate remedy in this case. A rule was violated, and that rule's primary purpose is to protect clients—not lawyers. *See* 1 Geoffrey C. Hazard, Jr., et al., The Law of Lawyering § 12.34 (4th ed. 2014 & Supp. 2018-2) ("[T]he primary objective of the conflicts rules . . . is to protect clients."). Disqualification in this

case protects Red Diamond and deters future violations of the Rules. An order consistent with this memorandum opinion will be entered.

**DONE** and **ORDERED** this February 25, 2019.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE